IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| THE GOODYEAR TIRE & RUBBER COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:20-cv-06347-JLG-EPD |
| CONAGRA FOODS, INC.; GENERAL MILLS, INC.; INLAND PRODUCTS, INC.; LANCASTER GLASS CORPORATION; MASCO CABINETRY LLC; NATIONAL OILWELL VARCO, INC.; OSCO INDUSTRIES, INC.; and R.J. REYNOLDS TOBACCO HOLDINGS, INC., | ) ) ) ) ) ) ) ) ) | AMENDED COMPLAINT |
| Defendants. | ) | |

## AMENDED COMPLAINT

For its Amended Complaint, Plaintiff The Goodyear Tire & Rubber Company

(hereinafter "Plaintiff" or "Goodyear"), by and through counsel, alleges as follows:

### STATEMENT OF THE CASE

1.     This is a civil action pursuant to the provisions of the Comprehensive

Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §

9601 *et seq.* ("CERCLA"). Plaintiff asserts that there has been a release and/or threatened release

of hazardous substances from a facility known as the Jackson County Landfill Site located in

Liberty Township, Jackson County, Ohio ("JCL Site" or "Site"). The hazardous substances at the

JCL Site have allegedly contaminated the soil and groundwater at the JCL Site and have

allegedly threatened the public health and the environment. Each Defendant in this case is a

potentially responsible party ("PRP") that generated materials containing hazardous substances

that were disposed of at the JCL Site. Through this action, Plaintiff seeks recovery of each

Defendant's respective equitable share of approximately $12.7 million in past response costs that Plaintiff has incurred at the JCL Site through December 4, 2020 in response to the release or threatened release of hazardous substances into the environment at and from the JCL Site, along with a declaration of each Defendant's liability for its respective equitable share of future response costs to be incurred by Plaintiff (and its assignors) at the JCL Site.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over Count I pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), providing federal jurisdiction over controversies arising under CERCLA, and pursuant to 28 U.S.C. § 1331, providing federal jurisdiction over controversies involving questions of federal law. The Court also has jurisdiction over the request for declaratory relief in Count II pursuant to CERCLA Section 113, 42 U.S.C. § 9613, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper in this district pursuant to 42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. § 1391(b), because the release or threatened release of hazardous substances that give rise to this action occurred and/or are occurring at or from the JCL Site located in this judicial district.

## ALLEGATIONS COMMON TO ALL CLAIMS

4. The JCL Site, located at 1841 Smith Bridge Road (Jackson County Road 60) in the southeast quarter of Section 13, Liberty Township, Jackson County, Ohio, is a former industrial and municipal landfill that is no longer in operation. The footprint of the former landfill at the JCL Site is approximately 24 acres.

5. The JCL Site is bounded to the west and north by Salt Lick Creek, to the east by a parcel of land owned by Sanitation Commercial Services, Inc. ("SCS"), and to the southeast by

private land used in part for a private hunting club. Lake Katherine Nature Preserve is adjacent

and to the west of the Salt Lick Creek.

6.      On April 16, 1970, the Ohio Department of Health issued an approval to Donald

Jenkins for operation of a landfill at the JCL Site.

7.      From at least April 16, 1970 until March 15, 1972, Donald Jenkins owned and

operated the JCL Site, which was known as Jenkins Sanitary Landfill during the time period he

owned it.

8.      On March 15, 1972, the Ohio Department of Health approved the transfer of the

Jackson County Landfill Solid Waste License to J. Gregory Fields, Mr. Jenkins' son-in-law.

9.      Mr. Fields operated the JCL Site from at least March 15, 1972 until at least

August 31, 1987. SCS currently owns the majority of the land that constitutes the JCL Site. Mr.

Fields own and controls SCS.

10.     Shawn and Melissa Sexton own property, located at 2336 Smith Bridge Road,

Jackson, Ohio, including a small portion of land at the JCL Site and land east of, and adjacent to,

the JCL Site.

11.     During its operation between 1970 until at least August 31, 1987, the JCL Site

accepted "industrial waste" and/or "other waste" as defined in Ohio Revised Code § 6111.01 (C)

and (D), and/or "hazardous wastes" as defined in Ohio Revised Code § 3734.01(J), and/or

hazardous substances, as that term is defined in Section 101(14) of CERCLA, 42 U.S.C. §

9601(14).

12.     Wastes disposed of the JCL Site included municipal solid waste, wastes from

commercial and industrial operations, and/or drummed waste that contained at least the

following hazardous substances: acetone, polyester resin mixture, cyclohexanone,

dichloromethane, isobutyl alcohol, methyl ethyl ketone ("MEK"), methyl isobutyl ketone, toluene, xylene, and waste styrene mixture.

13.     On August 1-2, 1984, Ohio EPA conducted a preliminary assessment ("PA") at the JCL Site, and prepared an Addendum to the PA.

14.     On April 15, 1985, Ohio EPA issued Director's Final Findings and Orders removing the Jackson County Combined General Health Districts as an approved health district administering and enforcing solid waste disposal programs ("April 1985 DFFO").

15.     On May 14, 1985, the Jackson County Health Department appealed the April 1985 DFFO to the Environment Review and Appeals Commission ("ERAC").

16.     On September 18, 1985, the Director of Ohio EPA filed a motion at ERAC requesting that Mr. Fields be added to the April 1985 DFFO. ERAC granted this motion on September 19, 1985.

17.     On or about November 27, 1985, a Settlement Agreement, which resolved the ERAC appeal, was executed by the Jackson County Health Department, Mr. Fields, and Ohio EPA. The Settlement Agreement outlined the steps Mr. Fields needed to comply with to continue operating a landfill at the JCL Site and restore the Jackson County Combined General Health District's solid waste program.

18.     In a letter dated March 3, 1987, Ohio EPA stated that Mr. Fields had failed to comply with the Settlement Agreement and the case was being referred to the Ohio Attorney General's Office ("Ohio AG") for further action.

19.     On August 20, 1987, Ohio EPA issued Director's Final Findings and Orders requiring that the JCL Site immediately cease the acceptance of solid waste ("August 1987 DFFO").

20.     On September 10, 1987, SCS appealed the August 1987 DFFO to ERAC. This appeal was dismissed by ERAC on August 17, 1988. The dismissal was upheld by the Ohio Supreme Court in the case styled *Sanitation Commercial Services v. Shank*, 57 Ohio St. 3d 178 (1991).

21.     On December 7, 1994, Ohio EPA referred Mr. Fields, *inter alia*, to the Ohio AG and requested that the Ohio AG initiate an enforcement action against Mr. Fields, *inter alia*.

22.     On September 4, 1987, the Ohio AG filed a lawsuit against SCS, J. Gregory and Sally A. Fields in the United States District Court for the Southern District of Ohio in the case styled *State of Ohio s. Sanitation Commercial Services, et al.,* No. 2:97-cv-00984-GCS-TPK ("Ohio v. SCS Case").

23.     On June 10, 1998, the Ohio AG took the deposition of Mr. Fields in the Ohio v. SCS case.

24.     The Ohio v. SCS Case was settled by a Consent Decree entered by the Court on February 16, 1999. The Consent Decree required SCS and Mr. and Mrs. Fields to cease acceptance of waste at the JCL Site, and to pay $225,000 into a trust fund to be used for closure and/or post-closure care, and/or corrective measures at the JCL Site.

25.     Mr. Fields paid the $225,000 into a trust fund, but the trust fund was inadequate to complete the required measures for closure and/or post-closure care, and/or corrective measures at the JCL Site.

26.     In or about 1996, the Ohio EPA found high concentrations of ammonia, iron, nickel and lead above water quality criteria in leachate. It also found three volatile organic compounds ("VOCs"): benzene, xylene, and 1,2,4-trimethylbenzene. The benzene level was

identified as exceeding the maximum contaminant level ("MCL") as set forth in Ohio

Administrative Code (OAC) Ch. 3745-81.

27.     In June and August 2003, Ohio EPA collected samples from leachate seeps and

found benzene, arsenic and lead in excess of the maximum containment level ("MCL"), as set

forth in Ohio Administrative Code Rule 374581; and aluminum, iron, nickel, zinc and ammonia

were detected in excess of their water quality standard.

28.     On August 16, 2005, Ohio issued Final Findings and Orders for Remedial

Investigation and Feasibility Study ("RI/FS DFFOs") requiring Goodyear to complete a remedial

investigation ("RI") and feasibility study ("FS") at the JCL Site.

29.     The RI/FS DFFOs also named SCS, Mr. Fields and Mr. and Mrs. Sexton as

Respondents ("Landowner Respondents"), but their primary obligations related to ongoing JCL

Site access to allow Goodyear to perform the RI/FS at the JCL Site.

30.     Goodyear agreed to fund and perform the RI/FS according to the RI/FS DFFOs.

RI activities were conducted by Goodyear at the JCL Site from October 2006 through March

2007, and additional RI activities were conducted by Goodyear in February and March 2008,

September 2008, December 2008, and January 2009. Goodyear submitted revised RI reports to

Ohio EPA in July 2007 (Rev. 0), May 2008 (Rev. 1), February 2009 (Rev. 2), and April 2009

(Rev. 3). On April 29, 2009, the RI report was approved by Ohio EPA.

31.     Goodyear submitted revised FS reports to Ohio EPA in June 2009 (Rev. 0),

January 2010 (Rev. 1), and May 2010 (Rev. 2). On June 15, 2019, the final FS report was

approved by Ohio.

32.     The RI/FS activities identified the nature and extent of contamination and JCL

Site specific conditions. According to the approved RI and FS reports, the primary contaminants

of concern ("COCs") at the JCL Site include aluminum, antimony, arsenic, barium, benzene, cadmium, chromium, cobalt, copper, di-n-butyl-phthalate, lead, manganese, methane, mercury, PCB's, selenium, tetrachloroethylene vinyl chloride, and zinc. These reports also show that soils outside the JCL Site boundary were impacted with metals including aluminum, arsenic, iron, manganese, thallium, vanadium, and zinc. Further, they show that ground water contamination was located at three different zones and found to contain metals and VOCs above their respective action levels, including vinyl chloride, tetrachloroethylene, arsenic, and mercury. Soil gas sampling found an extensive number of VOCs as well as methane being released into the atmosphere. Further, leachate was found to be seeping from the landfill at a rate of up to 9,000 gallons per day.

33.    In February 2015, based on the RI/FS results, Ohio EPA issued a Preferred Plan that outlined Ohio EPA's preferred alternative to remediate contamination at the JCL Site. Ohio EPA held a public meeting on April 9, 2015 at the Jackson City Council Chambers located at 199 Portsmouth Street in Jackson, Ohio to explain the Preferred Plan. Oral and written comments were accepted at this meeting and during the comment period, which ran from February 17, 2015 to April 17, 2015.

34.    In September 2015, based on the RI/FS results, Ohio EPA's Preferred Plan, and the consideration of comments received during the comment period, Ohio EPA issued a Decision Document for the remediation of the JCL Site. This Decision Document outlined the following major components of the selected remedial alternative: a geomembrane cap, ground water monitoring, a soil gas collection system, a leachate collection system, Site security, a long-term operations and maintenance plan, institutional controls, and a potential contingency to evaluate

and possibly install a wetland for treatment of leachate if a sufficient amount of leachate is being generated.

35. On December 16, 2016, Ohio EPA issued Final Findings and Orders for Remedial Design and Remedial Action ("RD/RA DFFOs") outlining the remedy required to be conducted at the Site based on the results of the RI/FS, and Ohio EPA's Preferred Plan and Decision Document. The effective date of the RD/RA DFFOs was the date they were entered in the Journal of the Director of Ohio EPA.

36. Goodyear agreed to initially fund and perform the work required by the RD/RA DFFOs.

37. The RD/RA DFFOs also named SCS, Mr. Fields and Mr. and Mrs. Sexton as Respondents, but their primary obligations related to ongoing JCL Site access and deed restrictions to allow Goodyear to perform the RD/RA at the JCL Site.

38. Through December 4, 2020, Plaintiff has incurred $12,663,743.13 to fund and perform the work required by the RD/RA DFFOs at the JCL Site. Plaintiff will continue to incur millions of dollars in the future to initially fund and perform the remaining obligations under the RD/RA DFFOs.

39. The response costs incurred to date and to be incurred in the future by Plaintiff are necessary to address the release and/or threatened release at the JCL Site, and are required by Ohio EPA under the RD/RA DFFOs. As such, these past and future response costs are consistent with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 CFR Part 300 ("NCP").

40. In December 2019, at the request of several Defendants, Plaintiff entered into a one-year tolling agreement with all Defendants, with a December 11, 2019 effective date and

December 11, 2020 expiration date, to allow Plaintiff and all Defendants to engage in a private mediation process to try to resolve Plaintiff's CERCLA past and future response cost claims against all Defendants at the JCL Site without the need for this lawsuit. After an exchange of settlement offers/counteroffers between Plaintiff and a bulk of the Defendants, Plaintiff proposed three potential private mediators for the mediation process contemplated by the one-year tolling agreement. Thereafter, Defendants refused to participate in the private mediation process contemplated by the one-year tolling agreement, prompting the filing of this lawsuit on the tolling agreement expiration date.

## THE PARTIES

41.     Plaintiff is incorporated under the laws of the State of Ohio and is engaged in the business of manufacturing, distributing, and selling rubber products.

42.     A 1970 document titled "Report on the Structure and Operational Procedure for Jenkins Sanitary Landfill" (Stull, 1970) states that "Goodyear is bringing in ten to twenty metal (55 gallon drum) acetone containers each week which are set aside until the acetone residue clinging to the container is cool. There is as much as one gallon in some containers which Mr. Jenkins is emptying into a cell along with other waste. A scrap metal company now is hauling away the metal drums."

43.     On June 4, 1984, Plaintiff responded to a CERCLA Section 104(e) inquiry, indicating that it took an estimated 5,772 drums of waste materials to the JCL Site between 1974-80. There are no records or receipts of such materials being transported and disposed of at the JCL Site before 1974 (except for the reference in the 1970 Report in Paragraph No. 41 above).

44.     According to Mr. Fields, barrels (or drums) brought into the JCL Site by generators were crushed, unless the contents were solidified, and there were no barrel trenches or designated barrel areas at the JCL Site. Mr. Fields believes that Plaintiff's estimation of 5,772 drums taken to the JCL Site between 1974-80 is "a gross overestimation." He believes that Plaintiff's waste was a small percentage compared to other industrial waste customers at the JCL Site.

45.     The JCL Site records are sparse and consist of a few truck logs and other landfill operator documents during a portion of the landfilling operations; some correspondence and other documents involving the landfill owners/operators, various landfill customers, and/or Ohio EPA and the Jackson County Health Department; the June 1998 Deposition of Mr. Fields in the Ohio v. SCS Case; various interview summaries of Mr. Fields and other persons with some knowledge of landfilling operations and customers of the JCL Site; and responses by various potentially responsible parties ("PRPs") to requests for information from Ohio EPA regarding the JCL Site.

46.     Defendant ConAgra Foods, Inc. ("ConAgra") is the successor to Banquet Foods.

47.     In or about 1981, ConAgra Brands, Inc. d/b/a ConAgra Foods, Inc. acquired Banquet Foods.

48.     Banquet Foods purchased the former Ralston Purina facility located at 2403 Pennsylvania in Wellston, Ohio, and sold it to Jeno's Pizza in 1981.

49.     According to Mr. Fields, the waste streams disposed of at the JCL Site from Banquet Foods consisted of food waste, cooking oil, dock waste, and pesticides used for fly control. Mr. Fields noted that Banquet Foods was a major waste volume contributor to the JCL

Site as its waste streams were transported to and disposed of at the JCL Site 24 hours/day, 7 days/week.

50.     According to Herbert Dahl, a driver that transported waste streams to the JCL Site, he drove the "nine" route, driving Packer trucks to Banquet Foods, sometimes picking up more than one load of waste per day. Mr. Dahl noted that occasionally, the waste streams from Banquet Foods would include drums, which would be picked up, crushed in the Packer truck, and transported to and disposed of at the JCL Site.

51.     Another driver, Michael Weldman, who drove a roll-off truck, indicated that he picked up waste from Banquet Foods and transported such waste to be disposed of at the JCL Site seven days a week.

52.     A May 22, 1978 letter from the Jackson County Board of Health to Ohio EPA indicates that Banquet Foods was the recipient of a May 17, 1978 letter from Ohio EPA informing Banquet Foods that it may be in violation of State of Ohio requirements because it was disposing of hazardous toxic liquids or semi-solids at the JCL Site.

53.     In addition to the hazardous substances associated with the business of manufacturing packaged foods and the waste streams described in the preceding Paragraphs related to Banquet Foods, Banquet Foods' waste streams also would have consisted of food processing waste, meat processing waste, dock waste, pesticides used for fly control, general office waste, and maintenance/cleaning waste. These types of waste streams would have contained at least the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, mercury, MEK, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

54. By letter dated August 30, 2019, Plaintiff demanded that ConAgra reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the JCL Site.

55. To date, ConAgra has refused to cooperate and has not paid any response costs incurred by Plaintiff at the JCL Site.

56. Defendant General Mills, Inc. ("General Mills") is the successor to Jeno's, Inc.

57. Jeno's, Inc. was founded in or about 1850 in Minnesota by Jeno Paulucci, and operated at least two plants in Ohio, including the facility described above located at 2403 Pennsylvania Ave. in Wellston, Ohio, that Jeno's, Inc. purchased from Banquet Foods.

58. According to the Ohio Secretary of State records, Jeno's, Inc. incorporated an entity with the same name in or about 1982 in Ohio.

59. According to the Ohio Department of Taxation and publicly available records, Jeno's, Inc. operated the facility located at 2403 South Pennsylvania Ave. in Wellston, Ohio from 1981 to at least 1985.

60. In or about December 10, 1985, The Pillsbury Company ("Pillsbury") acquired assets of Jeno's, Inc., including the Wellston plant.

61. On or about 2001, General Mills Inc. acquired Pillsbury. After this acquisition, General Mills continued to use the trade name Pillsbury, and Pillsbury ceased to exist as a separate company.

62. According to Mr. Fields, waste from Jeno's, Inc. that was transported and disposed of at the JCL Site consisted of at least food processing waste that he described as a sludge that could contain anything of a semi-solid consistency, including, for example, dough,

cream corn, and chicken waste. He also stated that Jeno's, Inc. had the right or option to dump

other waste streams from dump hoppers into the sludge containers.

63.     A March 14, 1983 Ohio EPA report recommending that the JCL Site's application

for a permit to accept semi-solid waste not be approved until compliance was demonstrated and

certified. This report indicated that the JCL Site was proposing to accept 40 to 60 cubic yards per

day of sludge cake from Jeno's, Inc. which was generated during a two-week period.

64.     According to JCL Site records, Jeno's, Inc. had a polychlorinated biphenyl

("PCB") spill in 1984. In an August 2, 1984 letter, Jeno's, Inc. informed Ohio EPA that solid

waste, apparently from the cleanup of this PCB spill, consisting of empty 55-gallon drums,

clothing and sta-dry materials, were to be transported to and disposed of at the JCL Site.

65.     In addition to the hazardous substances associated with the business of

manufacturing packaged foods and the waste streams described in the preceding Paragraphs

related to Jeno's, Inc., Jeno's, Inc.'s waste streams also would have consisted of food processing

waste, meat processing waste, dock waste, general office waste, and maintenance/cleaning waste.

These types of waste streams would have contained at least the following hazardous substances:

acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead,

manganese, mercury, MEK, methylene chloride, nickel, PCBs, perchloroethylene, toluene,

trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

66.     To date, General Mills has not paid any response costs incurred by Plaintiff at the

JCL Site.

67.     During the relevant time period, Defendant Inland Products, Inc. ("Inland

Products") was engaged in the business of rendering animal waste to produce purified fat and

protein products such as soap, livestock feed and chemicals.

68.     According to Sandy Adams (formerly Sandy Leedy), a former secretary at the JCL Site, Inland Products had a waste stream disposed of on a regular basis at the JCL Site that consisted of a liquid substance with animal carcasses. Ms. Adams was unsure how many times per week that waste from Inland Products was transported to and disposed of at the JCL Site.

69.     In addition to the hazardous substances associated with the business of rendering animal waste and the waste streams described in the preceding Paragraphs related to Inland Products, Inland Products' waste streams also would have consisted of meat processing waste, general office waste, and maintenance/cleaning waste. These types of waste streams would have contained at least the following hazardous substances: acetone, benzene, chromium, copper, decloroethylene, dichlorobenzene, lead, MEK, methylene chloride, perchloroethylene, toluene, tricholoroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

70.     Additionally, JCL Site records describe Inland Products' waste as containing at liquid substances associated with animal carcasses.

71.     By letter dated August 30, 2019, Plaintiff demanded that Inland Products reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the JCL Site.

72.     To date, Inland Products has refused to cooperate and has not paid any response costs incurred by Plaintiff at the JCL Site.

73.     Pursuant to an April 1, 2021 Joint Stipulation filed in this case (Dkt. No. 42), Defendant Lancaster Glass Corporation ("Lancaster Glass") admits it is the legal successor to Jackson Plastics Corporation for purposes of this case only.

74.     Jackson Plastics Corporation operated a facility located at 270 South Bennett Avenue in Jackson, Ohio starting as early as the 1960s.

75.     According to Mr. Fields, Jackson Plastics Corporation transported and disposed of its own waste at the JCL Site. Mr. Fields described Gaylord boxes from Jackson Plastics Corporation that contained powdered material from mold materials made by Jackson Plastics Corporation.

76.     According to a witness named Marvin Landrum, Jackson Plastics Corporation transported and disposed of plastics and rubber moldings every day at JCL Site.

77.     According to a witness named Mike Blackburn, the waste streams from Jackson Plastics Corporation also included pallets, cardboard boxes, and different types of extruded plastics transported and disposed of at the JCL Site in a roll-off container.

78.     In addition to the hazardous substances associated with the business of manufacturing plastic injection moldings and furnishings and the waste streams described in the preceding Paragraphs related to Jackson Plastics Corporation, Jackson Plastics Corporation's waste streams also would have consisted of fabrication waste, rubber products waste, general office waste, and maintenance/cleaning waste. These types of waste streams would have contained at least the following hazardous substances: acetone, antimony oxide, arsenic, benzene, cadmium, cadmium yellow, chromium, chromium oxide, cobalt blue, copper, dichloroethylene, lead, lead oxide, manganese, mercury, MEK, methylene chloride, nickel, nickel titanate, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, zinc, and zinc oxide.

79.     By letter dated August 30, 2019, Plaintiff demanded that Lancaster Commercial Products, LLC reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the JCL Site.

80.     In response to the August 30, 2019 demand letter Plaintiff sent to Lancaster Commercial Products, LLC, an attorney identified himself as counsel for Lancaster Glass, the proper legal successor to Jackson Plastics Corporation for purposes of this case.

81.     To date, Lancaster Glass has refused to cooperate and has not paid any response costs incurred by Plaintiff at the JCL Site.

82.     Defendant Masco Cabinetry LLC ("Masco Cabinetry") is the successor to Merillat Cabinet.

83.     Merillat Industries was founded in Michigan in or about 1946 as a manufacturer of kitchen cabinets. It operated a facility located at 960 East Main Street in Jackson, Ohio.

84.     In or about 2004, Merillat Cabinet was sold to Masco Corporation and merged to form Masco Cabinetry LLC d/b/a Merillat Cabinetry.

85.     According to the Ohio Secretary of State, Masco Builder Cabinet Group adopted the alias of "Merillat" in or about 2009.

86.     Through a series of mergers and name changes, Merillat Industries formed Masco Builder Cabinet Group, which then formed the new company Masco Cabinetry in or about 2010.

87.     EPA assigned EPA Identification Number OHD081280539 to Merillat Industries/Masco Cabinetry/Masco Corp. at the same Jackson, Ohio address located at 960 East Main Street described above.

88.     Masco Cabinetry's website also states that it does business as Merillat Cabinetry, an alias it registered to use in Michigan.

89.     Masco Cabinetry retained the same employees and shares the same trade name, type of business, location, and EPA Identification Number as Merillat Cabinet.

90.     According to Mr. Fields, Merillat Cabinet manufactured cabinets and its waste streams consisted primarily of sawdust and included banding, pallets, and warehouse materials. Mr. Fields further noted that the waste from Merillat Cabinet was transported and disposed of at the JCL Site starting in the late 1970s. He further noted that Merillat Cabinet would transport and dispose of two tractor-trailer loads of waste every day at the JCL Site. He further noted that Merillat Cabinet had a spray paint line at its facility.

91.     In addition to hazardous substances associated with the business of manufacturing cabinetry and the waste streams described in the preceding Paragraphs related to Merillat Cabinet, Merillat Cabinet's waste streams also would have consisted of fabrication waste, wood furniture waste, paint waste, general office waste, and maintenance/cleaning waste. These types of waste streams would have contained at least the following hazardous substances: acetone, benzene, cadmium, chromium, copper, ethyl benzene, dichloroethylene, lead, manganese, MEK, methanol, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, vinyl chloride, xylene, and zinc.

92.     By letter dated August 30, 2019, Plaintiff demanded that Masco Cabinetry reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the JCL Site.

93.     To date, Masco Cabinetry has refused to cooperate and has not paid any response costs incurred by Plaintiff at the JCL Site.

94.     Defendant National Oilwell Varco, Inc. ("NOV") is the successor to Robbins & Myers.

95.     Robbins & Myers was founded in or about 1878 by Chandler Robbins and James Myers as an iron foundry that initially manufactured machinery and eventually fans and motors.

17

96. Robbins & Myers maintained a corporate headquarters Springfield, Ohio, and operated facilities in both Dayton and Gallipolis, Ohio.

97. Robbins & Myers operated its Motor Products Division at 250 Bob McCormick Road in Gallipolis, Ohio during the relevant time period.

98. In 1980, Robbins & Myers purchased ElectroCraft Corporation, which became part of its Motor Products Division and operated at the Gallipolis facility.

99. In February 2013, NOV acquired Robbins & Myers.

100. Mr. Fields noted that Robbins & Meyers was an electrical motor and fan manufacturer that generated a lot of general waste that was transported and disposed of at the JCL Site.

101. In addition to the hazardous substances associated with the business of manufacturing electrical motors and fans, the waste streams of Robbins & Myers would have also consisted of electrical waste, metal fabrication waste, metal finishing waste, metal processing waste, general office waste, and maintenance/cleaning waste. These types of waste streams would have contained at least the following hazardous substances: acetone, benzene, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, MEK, methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

102. By letter dated August 30, 2019, Plaintiff demanded that NOV reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the JCL Site.

103. To date, NOV has refused to cooperate and has not paid any response costs incurred by Plaintiff at the JCL Site.

104.    Defendant OSCO Industries, Inc. ("OSCO") is in the business of operating foundries and producing commercial metal castings used in a broad range of products.

105.    OSCO generated waste streams that were transported and disposed of at the JCL Site, which included foundry scrap sand, Panghorn colletor dust, shot blast collector dust, cupola slag/particulate, and refractory and plant trash.

106.    According to JCL Site records, OSCO generated the following amounts of waste in the following years: 1981 – 174 tons per week; 1981 – 174 tons per week; 1986 – 232 tons per week; 1987 – 272 tons per week; 1988 – 111 tons per week; and 1989 – 127 tons per week.

107.    The September 2015 Decision Document from Ohio EPA described herein noted that foundry sand containing COCs was used as daily cover at the JCL Site, and was also disposed of in a separate area east of and adjacent to the main landfill before being placed in the main portion of the JCL Site during the remedial action activities.

108.    A significant portion of the response costs incurred and to be incurred by Plaintiff in excess of one million dollars are directly related to remediation of foundry sand waste generated by OSCO that was disposed of in the separate at the JCL Site, which Ohio EPA required to be remediated..

109.    Mr. Fields believes that the JCL Site started accepting waste from OSCO in the mid- to late-1970s, but he also believed that it could have been when the OSCO plant began its operations. Based on a document showing annual melt tonnages at the OSCO plant, the OSCO plant appeared to be in operation as early as 1966, so it is possible that OSCO's waste may have been transported and disposed of at the JCL Site when it began operations in 1970.

110.    A letter dated June 16, 1986 from Ohio EPA to the Jackson County Health Department states that "a substantial quantity of casting sand and bag house dust from OSCO

was observed as having been open dumped apart from the working phase" of the JCL Site, which indicates that OSCO was still transporting and disposing of waste at the JCL Site as of that date.

111. Mr. Fields further stated that OSCO's foundry sand waste was placed in a separate location east of areas 1 and 3 at the JCL Site, and that this waste was often hot and could not be placed with other wastes at the JCL Site due to potential fire risks.

112. In addition to the hazardous substances associated with the business of foundry and metal casting and the waste streams described in the preceding Paragraphs related to OSCO, OSCO's waste streams also consisted of metal fabrication waste, metal finishing, metal processing waste, general office waste, and maintenance/cleaning waste. These types of waste streams would have contained at least the following hazardous substances: acetone, arsenic, barium, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, mercury, MEK, nickel, perchloroethylene, selenium, toluene, trichloroethane, trichloroethylene, xylene, and zinc.

113. By letter dated August 30, 2019, Plaintiff demanded that OSCO reimburse Plaintiff for a specified amount of response costs incurred and to be incurred by Plaintiff at the JCL Site.

114. To date, OSCO has refused to cooperate and has not paid any response costs incurred by Plaintiff at the JCL Site.

115. Pursuant to an April 1, 2021 Joint Stipulation filed in this case (Dkt. No. 43), Defendant R.J. Reynolds Tobacco Holdings, Inc. ("R. J. Reynolds Tobacco") admits it is the legal successor to Reynolds Foods Company ("Reynolds Foods") for purposes of this case only.

116. Reynolds Foods acquired the food business Chun King, located at 100 E. Broadway in Jackson, Ohio and operated that facility from approximately 1967 to 1985.

117.    Reynolds Foods was engaged in the business of manufacturing packaged foods under various brands at the Jackson, Ohio facility located at 100 E. Broadway.

118.    Mr. Fields stated that Reynolds Food was a major customer of the JCL Site when he started operating the landfill at the JCL Site in 1972. He further stated that the waste streams from Reynolds Foods included food by-products and pesticides. He noted that Reynolds Foods had a liquid or semi-liquid waste stream that would be transported and disposed of at the JCL Site in 1,000 or 1,500-gallon tankers. He stated that he believed this waste stream was from a catch basin that was used by Reynolds Foods to filter out solids from the facility's waste streams. He also stated that the waste streams from Reynolds Foods included grease.

119.    A February 24, 1970 "Report on the Structure and Operational Procedures for Jenkins Sanitary Landfill, Jackson, Ohio" indicates that the quantity of waste from Reynolds Foods transported and disposed of at the JCL Site at that time was 12 tons per day in 2 to 3 dump trucks.

120.    Reynolds Foods was the recipient of a May 17, 1978 letter from Ohio EPA informing Reynolds Foods that it may be in violation of State of Ohio requirements because it was disposing of hazardous toxic liquids or semi-solids at the JCL Site.

121.    In addition to the hazardous substances associated with the business of manufacturing packaged foods and the waste streams in the preceding Paragraphs related to Reynolds Foods, Reynolds Foods' waste streams would have also consisted of food processing waste, general office waste, and maintenance/cleaning waste. These types of waste streams would have contained at least the following hazardous substances: acetone, benzene, cadmium, chromium, copper, dichlorobenzene, dichloroethylene, lead, manganese, mercury, MEK,

methylene chloride, nickel, perchloroethylene, toluene, trichloroethane, trichloroethylene, vinyl chloride, xylene, and zinc.

122.    To date, R. J. Reynolds Tobacco has refused to cooperate and has not paid any response costs incurred by Plaintiff at the JCL Site.

## COUNT I – CONTRIBUTION UNDER CERCLA

123.    Plaintiff realleges and incorporates by reference Paragraph Nos. 1 through 122 of this Amended Complaint as if fully restated herein.

124.    Sections 113(f)(1) and (3)(B) of CERCLA, 42 U.S.C. §§ 9613(f)(1) and (3)(B), provide, in relevant part, that:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a)....
>
> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement....

125.    Section 107(a)(3)–(4) of CERCLA, 42 U.S.C. §§ 9607(a)(3)–(4), provides, in relevant part, that:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section --
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for -- (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian Tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent

with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

126. "Disposal" is defined in CERCLA Section 101(29) by reference to the Solid Waste Disposal Act ("SWDA"). 42 U.S.C. § 9601(29). The SWDA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

127. "Facility" is defined in CERCLA Section 101(9) as "any building, structure, installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed . . . ." 42 U.S.C. § 9601(9).

128. "Hazardous substance" is defined in CERCLA Section 101(14) by reference to other federal statutes and by reference to a list of substances published by EPA at 40 C.F.R. § 302.4. 42 U.S.C. § 9601(14).

129. "Owner" or "operator" is defined in CERCLA Section 101(20) as ". . . in the case of an onshore facility or an offshore facility, any person owning or operating such facility . . . ." 42 U.S.C. § 9601(20).

130. "Person" is defined in CERCLA Section 101(21) as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(20).

131. "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or

disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . ." 42 U.S.C. § 9601(22).

132.   "Response" is defined in CERCLA Section 101(25), and includes "removal" actions, "remedial" actions, and enforcement activities related thereto. 42 U.S.C. § 9601(25).

133.   The JCL Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

134.   There has been a "release" and/or a threatened "release" of "hazardous substances" at the JCL Site, which has caused the incurrence of "response costs" by Plaintiff, within the meaning of Sections 101(22), 101(14) and 107 of CERCLA, 42 U.S.C. §§ 9601(22), 9601(14) and 9607.

135.   Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

136.   Each of the Defendants is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

137.   As detailed herein in the specific allegations against each Defendant, pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(3) and/or 9607(a)(4), each Defendant is liable as an arranger or generator of materials containing hazardous substances, which materials were treated and/or disposed at the JCL Site; and/or a transporter of hazardous substances who selected the JCL Site for the treatment and/or disposal of such hazardous substances, and who transported such hazardous substances to the Site.

138.    As a result of the release and threatened release of hazardous substances at or from the JCL Site, Plaintiff has incurred response costs and will continue to incur costs of "response," as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

139.    Plaintiff has resolved its liability to Ohio EPA for matters covered in the RD/RA DFFOs.

140.    Pursuant to CERCLA Sections 107 and 113, 42 U.S.C. §§ 9607 and 9613, each Defendant is strictly liable for its respective equitable share of the past and future response costs incurred and to be incurred by Plaintiff in response to the release or threatened release of hazardous substances at and from the JCL Site.

141.    No Defendants have resolved their liability to Plaintiff or Ohio EPA.

142.    Through December 4, 2020, Plaintiff has incurred $12,663,743.13 in response costs to fund and perform the work required by the RD/RA DFFOs at the JCL Site.

143.    The response costs that Plaintiff has incurred to date and will incur in the future to fund and perform the work required by the RD/RA DFFOs at the JCL Site are consistent with the NCP.

144.    Plaintiff is entitled to contribution from all Defendants under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for Defendants' respective equitable shares of all costs and damages incurred by Plaintiff, including applicable interest as provided for in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against all Defendants finding that they are each liable under CERCLA and are obligated to pay for their respective equitable shares of all response costs incurred by Plaintiff to fund and perform the RD/RA DFFOs at the JCL Site, including appropriate pre-judgment interest, associated with the

JCL Site. Plaintiff further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT II – DECLARATORY RELIEF

145.　Plaintiff alleges and incorporates by reference Paragraph Nos. 1 through 144 of this Complaint as if fully restated herein.

146.　There is a present and actual controversy between the Plaintiff and all Defendants concerning their respective rights and obligations with respect to the response costs associated with the JCL Site.

147.　Plaintiff seeks a declaratory judgment under the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202, against all Defendants holding them liable for their respective equitable shares of response costs, that will be binding in any subsequent action to recover further response costs at the Site.

148.　Plaintiff is entitled to a declaratory judgment against all Defendants for their respective equitable shares of all future response costs incurred by Plaintiff in connection with the JCL Site.

WHEREFORE, the Plaintiff respectfully prays that this Court enter a declaratory judgment against all Defendants finding that they are each liable under CERCLA and are obligated to pay for their respective equitable shares of all future response costs associated with the JCL Site. The Plaintiff further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such relief as the Court may deem just and appropriate under the circumstances.

Dated: April 16, 2021              Respectfully submitted,

                                s/ Sharon G. Newman

                                Sharon G. Newman, Esq. (Ohio Bar No.: 54266)
Trial Attorney
Jeffrey D. Talbert (admitted *pro hac vice*)
James W. Beers, Jr., Esq. (admitted *pro hac vice*)
Katherine L. Oaks, Esq. (admitted *pro hac vice*)
PRETI, FLAHERTY, BELIVEAU &
PACHIOS, LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
207-791-3000
snewman@preti.com
jtalbert@preti.com
jbeers@preti.com
koaks@preti.com

Rachel D. Guthrie, Esq. (admitted *pro hac vice*)
Matthew T. Merryman, Esq. (admitted *pro hac vice*)
Ambereen K. Shaffie, Esq. (admitted *pro hac vice*)
THE JUSTIS LAW FIRM LLC
10955 Lowell Ave.
Suite 520
Overland Park, KS 66210-2336
Telephone (913) 955-3710
Facsimile: (913) 955-3711
rguthrie@justislawfirm.com
mmerryman@justislawfirm.com
ashaffie@justislawfirm.com

ATTORNEYS FOR PLAINTIFF THE
GOODYEAR TIRE & RUBBER COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 16, 2021, a copy of the foregoing Amended Complaint was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access the filing through the Court's Electronic Case Filing System.

s/ Sharon G. Newman
Sharon G. Newman