IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THE GOODYEAR TIRE & RUBBER COMPANY,  )<br>)<br>)<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>)<br>)<br>CONAGRA FOODS, INC., *et al.*,  )<br>)<br>)<br>)<br>Defendants.  ) | Case No. 2:20-cv-06347-MHW-EPD<br><br>Hon. Michael H. Watson<br>Hon. Magistrate Elizabeth A. Preston Deavers |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOINT
MOTION TO EXCLUDE THE EXPERT REPORT OF KEITH A. ZAHNISER, PH.D.**

Plaintiff The Goodyear Tire & Rubber Company ("Goodyear") responds in opposition to OSCO Industries, Inc. ("OSCO") and R.J. Reynolds Tabacco Holdings, Inc.'s ("Reynolds") (collectively "the Defendants") joint motion to exclude the expert report of Keith A. Zahniser ("Dr. Zahniser"). Because the Defendants want to rely on a lack of evidence as their primary defense, they inappropriately move to exclude Dr. Zahniser's report by taking issue with the documents he examined, what he concluded from those documents, and appear to make the case that a historian cannot be an expert unless they follow one specific methodology. Dr. Zahniser, a historian with almost 20 years of experience followed an accepted methodology for historians by researching and reviewing all historically relevant newspaper articles, business information, manuscript collections, Ohio Environmental Protection Agency ("Ohio EPA") documents, deposition transcripts, declarations, and other information he obtained to try to understand what information exists for the relevant timeframe of landfill's operation. Notably, Defendants did not even depose

Dr. Zahniser to understand his methodology or approach. Dr. Zahniser's report is undoubtedly helpful, and Plaintiff respectfully requests that the Court deny Defendants' Motion to exclude Dr. Zahniser's report.

## BACKGROUND

The Jackson County Landfill ("JCL" or "Site") began operations in the early 1970s as a solid waste disposal site upon approval from the Ohio Department of Health. The Site continued operations until 1987, when the Ohio Environmental Protection Agency ("Ohio EPA") ordered the landfill to cease accepting waste. During its operation, the Site received waste from municipal and industrial sources, including the Defendants. Although each Defendant in this case arranged to transport waste streams containing hazardous substances to the Site for disposal, Goodyear alone has stepped up to remediate the Site. To date, Goodyear has incurred over $12.6 million in response costs for the remediation of the JCL. As authorized under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), Goodyear brought this suit seeking contribution from Defendants for costs it has incurred—and will continue to incur—based on hazardous wastes sent to the JCL by both Reynolds and OSCO. 42 U.S.C.A. § 9613(f).

Defendants are now requesting the Court to exclude the expert report of Keith A. Zahniser, Ph. D., under Fed. R. Evid. 702. Defendants argue that Zahniser's expert report should be excluded from consideration in this case because it is unreliable, in part because he does not follow Defendants' arbitrary methodology and he partially relied upon documents with information unfavorable to the Defendants' position. Defendants are wrong on both arguments.

I.  **Dr. Zahniser Qualifications, Methodology, and Opinions.**

Dr. Zahniser holds a Ph.D. in History from the University of California at Santa Barbara and has conducted historical research professionally for nearly twenty years. Ex. A, Zahniser

Curriculum Vitae. Dr. Zahniser is currently a Senior Historian at Historical Research Associates, Inc. ("HRA"). *Id.* In this role, he researches and prepares reports on historical matters for a wide variety of entities, including federal government agencies and private companies, focusing on issues of historic contamination, which include complex multi-party Superfund sediment sites. *Id*. Dr. Zahniser has also researched the land use and history of manufacturing and military entities, as well as the historical processes, production, and waste streams of operations at various hazardous waste sites. *Id*.

Goodyear asked Dr. Zahniser to evaluate currently available evidence and historical documents to produce a history of the Site, during its years of operation, and opine on whether certain entities disposed of their waste at the Site. In doing so, Dr. Zahniser reviewed technical documents produced by Ohio EPA pertaining to the Site and OSCO; local government documents; sworn declarations of former JCL employees; sworn declarations from former Ohio EPA employees; the deposition testimony of J. Gregory Fields; historical documents collected at the Jackson City Library (Jackson, Ohio) and the Ohio Historical Collection Library and Archives (Columbus, Ohio); and other documents obtained through discovery. ECF 204-1, Zahniser's Reynolds Report and ECF 204-2, Zahniser OSCO Report at ii-iii. Following his review of historical documents and evidence in the record, Dr. Zahniser gave opinions on whether or not Defendants sent waste to the Site, the timeframe in which Defendants sent waste to the Site, and the type of waste that was sent to the Site by OSCO and Reynolds.

II.     **Dr. Zahniser's Use of Fields Deposition, Interview Notes, and Kingsland Report.**

Defendants allege that Dr. Zahniser's report is unreliable because it inappropriately relied on three documents. The three documents at issue are the Deposition Transcript of JCL's former owner and manager J. Gregory Fields ("Fields' Deposition Transcript"), notes from an interview

3

of Mr. Fields shortly after his deposition ("Fields Interview Notes"), and the 2006 report of Bruce Kingsland who Goodyear hired to investigate the JCL ("Kingsland Report").

      i.    *Fields Deposition*

The first piece of evidence at issue is a transcript of a deposition of J. Gregory Fields, taken in *Ohio v. Sanitation Commercial Servs., et al.,* No. C2-97-984, on June 10, 1998. Mr. Fields, now deceased, was the owner and operator of the JCL Site between 1972 and 1987 when Ohio EPA ordered the Site to close. In his deposition, Assistant Attorney General Joseph P. Koncelik of the Ohio Attorney General's Office's Environmental Enforcement Section questioned Mr. Fields about "waste disposal history at the Jackson County Landfill and the types of waste that were accepted there." Ex. B, Deposition of Mr. J. Gregory Fields at 6:9-11. Mr. Fields was familiar with the day-to-day activities at the JCL site and even lived at the landfill for a time. *Id*. at 11:15–18. On January 26, 2023, Goodyear deposed Mr. Fields' widow, Mrs. Sally Fields, both in her personal capacity and as a 30(b)(6) representative of Sanitary Commercial Services ("SCS"). Mrs. Fields testified that nobody would have more firsthand knowledge of the JCL than Mr. Fields. Mrs. Fields also testified that Mr. Fields understood the importance of telling the truth in that deposition, that he would have been very truthful, and that he had no reason not to be truthful. Ex. C, Mrs. Fields 30(b)(6) Dep. Tr. At 37: 5-16.

During his deposition, Mr. Fields demonstrated his firsthand knowledge in discussing Defendants' waste in detail. Ex. B at 49:20–50:6, 96:6–14. Specifically, in regard to Reynolds' waste, Mr. Fields testified that Reynolds disposed of oil, grease, and semi-solid sludge at the landfill. Ex. B at 40:19–22, 49:20–50:6, 141:17–142:1. Reynolds brazenly objects to the well-established fact that it disposed of oil, grease, and sludge at the JCL. These waste streams contained hazardous substances. ECF 205-1, Expert Report of Dr. Kirk Brown on Reynolds at 32.

As the discovery process proceeded, the reliability of Fields' deposition became increasingly apparent, as time and time again the information gleaned from Mr. Fields' testimony was corroborated by documents, declarations, and other depositions. For example, in describing the "slop" disposed of at the landfill by Reynolds, Mr. Fields testified as follows:

> Well, they had like a—I was told after I got the site that they had a 2,000 gallon tank that was supposed to catch this material, and to keep everybody happy they pumped it every day or so or two or three in a thousand or fifteen hundred gallon truck, I don't remember the size of the truck, it was a small truck. And they would haul that in there, but what—what they didn't haul went right on through into the sewer system, but it was just like a beige slop, but it had a high oil content in it and if you let it lay there for an hour or two on the dirt the dirt looked oily.

Ex. B at 49:20–50:6. Mr. Fields discussed the Reynolds grease again when presented with a landfill inspection form that referenced large amounts of grease at the JCL:

> Q: I'm handing you what's marked as exhibit 26 titled "Sanitary Landfill Inspection Form," Jackson Landfill is identified under the name of the landfill and the date of this inspection is 7/17/72. The first sentence under comments and recollections reads, "problems of odor due to large amounts of grease from R.J.R.
>
> A: Yeah
>
> Q: Is that the same grease that we've been talking about; in your opinion would that be the same grease?
>
> A: It would stink when it got hot, yeah. It stunk all the time, it didn't have to be hot, it just smelled, it just didn't smell good.

Ex. B at 141:17–142:1. This testimony was corroborated by John Evans, a former mayor and city councilman of Jackson who also owned and maintained vending machines within the Reynolds facility prior to 1982. He stated in a sworn declaration:

> While operating my vending machine business, I maintained vending machines at the Reynolds Foods facility. I routinely visited the Reynolds Foods facility to maintain the vending machines. On at least one of those maintenance visits to the Reynolds Foods facility prior to 1982, I observed a large tanker truck connected to an approximately 20,000 gallon stationary tank. The large tanker truck was being loaded with oil and grease for disposal elsewhere.

Ex. D, Declaration of John Evans. A local newspaper article about the Reynolds facility stated that Reynolds deep-fried approximately 800,000 egg rolls per day in 1979. *See* Ex. E, 1979 Chillicothe Gazette Article. Mr. Fields' testimony is further corroborated by testing of Reynolds' wastewater in 1977, which indicated the plant's weekly wastewater output contained at least 1,000 pounds of oil and grease. Ex. F, 1977 Industrial Wastewater Survey. The city consistently fined Reynolds for sending wastewater with excess levels of oil and grease to the city sewer, which motivated Reynolds to dispose of its "slop" at the JCL. The city's fines to Reynolds are further corroborated by John Evans, stating, "[P]rior to 1982, the City of Jackson routinely issued fines to Reynolds Foods for violating their wastewater permits by discharging excess fats, oil, and grease into the city sewer." Ex. D. Another former city official, Ronald Speakman, further corroborated the oil and grease fines by stating, "[R]eynolds Foods violated their wastewater permits multiple times due to excess quantities of fat, oil, and grease and were issued a fine for each violation." Ex. G, Declaration of Ronald Speakman. An Ohio EPA official also stated in a letter that "[T]he old RJR facility did cause the city of Jackson some problems with their sanitary wastewater treatment facilities." Ex. H, 1982 Ohio EPA Letter. Mr. Fields also seemed to be familiar with the oil and grease fines, testifying that "[t]o keep everybody happy they pumped it every day or so or two or three in a thousand or fifteen hundred gallon truck. . ."). Ex. B at 49:20–24.

Other evidence further corroborates Mr. Fields's testimony about Reynolds's semi-solid waste streams. Regarding sludge waste from a catch basin at the Reynolds facility, in a 1977 letter from Reynolds to Burgess & Niple, Reynolds described its pretreatment facility as a "Stationary hydrasieve screen and dissolved air flotation clarifier." *See* Ex. F at 3. Jeno's operated its specialty food processing operation at 100 E Broadway in Jackson, Ohio in 1983, the former Reynolds

6

facility, approximately two years after Reynolds ceased operating the facility. *See* Ex. I, 1981 Chillicothe Article. In a 1983 letter from Jeno's to the Ohio EPA, Jeno's stated:

> Solid wastes from the plant are picked up by Sanitary Commercial Services, Inc. of Jackson, Ohio and we work with Mr. Greg Fields who owns the disposal company. On screen wastes from the pre-treatment operation, we will also arrange to have that material handled by Sanitary Commercial Services. The pre-treatment plant at the Jackson plant site consists of a receiving tank from which the waste is pumped over two parabolic screens to remove larger solids, with such solids augured to a bin outside the pre-treatment building.

Ex. J, 1983 Jeno's Letter to the Ohio EPA. Mr. Fields operated the landfill and waste disposal under his company, Sanitary Commercial Services ("SCS"). The sludge at issue in this case is the semi-solid waste augured from the screen, referenced in Ex. F and Ex. J, to a bin outside the facility. Mr. Fields also testified that Reynolds had "[a] catch basin, as I understood it, and it went directly to the city sewers, but it caught solids and they would pump those semi-solids off and they would haul those to the landfill. . ." Ex. B at 40:19–22. Bill Sherritt, a driver who worked at the JCL in the 1980s, stated in his declaration that he hauled sludge waste one to two times per week from Reynolds Foods to the JCL. *See* Ex. K, Declaration of Bill Sherritt.[1]

    ii.    *Fields Interview Notes*

The second piece of evidence at issue is notes from an October 10, 1998 interview with Mr. Fields on October 10, 1998. In the interview, Mr. Fields provided information about the waste disposal practices of Reynolds and OSCO. The information is consistent with Mr. Fields' deposition testimony given months earlier and is corroborated by documents gathered during discovery. For example, the interviewer noted that "Goodyear, RJ Reynolds, City of Oakhill, and the City of Jackson were customers when he bought the landfill." Ex. N, Fields Interview Notes at

---

[1] Later declarations from Sherritt, obtained by Reynolds, suggest Sherritt was likely hauling the sludge from the plant while it was operated by Jeno's in 1983. *See* Ex. K, L, and M, Declarations of Bill Sherritt.

1. Additionally, a 1970 Ohio Department of Health Report corroborates that Reynolds was a customer before the JCL was even licensed, and after it was licensed. *See* Ex. O, 1970 Stull Report.

Notably, OSCO's expert, Michael McLaughlin, also relied on the Fields Interview Notes. McLaughlin testified as such in his deposition:

> A: And I really didn't take any time with the other waste streams, although, you know, I did note that they were shipping more polystyrene apparently to the landfill than they were sending to customers, at least based on the Sharp & Associates—I can't remember his name—Struttman? Based on his interview of Fields back in the day.
>
> Q: And I notice you—we're going to talk about that as well, but you have bullets in your report where you summarize some of Struttmann's interview notes regarding Goodyear?
>
> A: Yes.
>
> Q: So that was information you considered?
>
> A: I wrote it down, so I must have considered it, yes.

Ex. P, Michael McLaughlin Deposition Transcript at 132:3–17. McLaughlin again confirmed he relied on the Fields Interview Notes later in the deposition:

> Q: Understood. We talked about this before, but on page 19 of your report you have some bullets that relate to your review of the interview of Greg Fields, the interview notes.
>
> A: I think this is pretty faithful to what Mr. Struttman wrote down. But yeah, this is—
>
> Q: Right, understood. But you took that, and you're relying on it in terms of talking about Goodyear's wastes; right?
>
> A: It's another data point. I'm going back to my numbers earlier. I think I need to redo my calculation.

Ex. P. McLaughlin Dep. Tr. at 190:12–191:1. As McLaughlin mentioned in his deposition, he also listed information in his report that he explicitly stated he gleaned from the Fields Interview Notes.

Ex. Q, Expert Report of Michael McLaughlin at 19–20.

8

  iii. *Kingsland Report*

The third piece of evidence is a report completed by private investigator Bruce Kingsland in 2006 for Goodyear. The report compiles the results of Kingsland's investigations of the JCL site and summarizes his findings based on interviews with witnesses and analysis of relevant documents, which he attached to the report. The report contains summaries of waste streams based on interviews with people containing firsthand knowledge. Ex. R, Kingsland Report. Documents obtained during discovery corroborated nearly all the information in this report.

The limited information about the defendants' waste streams in the Kingsland Report is corroborated by supporting documents. For example, the Kingsland Report lists Reynolds as disposing of twelve tons of waste per day the JCL, which is corroborated by the 1970 Ohio Department of Health document, Ex. S. The Kingsland Report includes information that OSCO disposed of sand and trash every day as well as pangborne dust and moldings. Ex. R at GY0001895, GY0001928. A 1986–1987 waste survey corroborates these waste streams by listing OSCO as producing 176.5 tons of foundry sand, 27.1 tons of slag and refractory waste, and 4.8 tons of trash and paper per week in 1986. Ex. T., 1986–1987 Waste Survey.

## LEGAL STANDARD OF ADMISSIBILITY FOR EXPERT TESTIMONY

Under the Federal Rules of Evidence, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if: (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has reliability applied principles and methods to the facts of the case. Fed. R. Evid. 702.

The Sixth Circuit has adopted a three-part test for determining the admissibility of an expert's opinion, which are: (1) the witness must be qualified by knowledge, skill, experience, training, or education; (2) the testimony must be relevant, meaning it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony must be reliable. *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014). It is the obligation of the party offering the expert's testimony to prove the expert's qualifications by a preponderance of the evidence. *Id.*

The Court in *Daubert* laid out standards for assessing the reliability and relevance of expert witness testimony. Both the Sixth Circuit and the United States Supreme Court, however, have stated that the *Daubert* factors do not constitute a "definitive checklist or test[.]" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). For example, the United States Supreme Court in *Kumho Tire Co.* summarized the reliability requirement of *Daubert* as making "[c]ertain that an expert, whether basing testimony upon professional studies or professional experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The Sixth Circuit has further held that the reliability test is flexible, and the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (quoting *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001)); *Kumho Tire Co.*, 526 U.S. at 138. Moreover, the Supreme Court noted that expert witnesses are given "testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.' . . . The Rules grant that latitude to all experts, not just to 'scientific' ones." *Kumho Tire Co.*, 526 U.S. at 148.

21130055.1

The Rule 702 analysis is particularly flexible in bench trials. Rule 702 codifies the United States Supreme Court's mandate that the trial judge serve as a "gatekeeper" in making determinations regarding expert testimony. *Id*.; *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993). However, the gatekeeper doctrine "was designed to protect juries and is largely irrelevant in the context of a bench trial," as is the case here. *Deal v. Hamilton Cnty. Bd. of Educ*., 392 F.3d 840, 852 (6th Cir. 2004). That is because, in a bench trial, there is little reason to exclude evidence *in limine* when it will be heard and weighed by a judge "without fear that prejudicial or improper evidence will taint the jury." *Bank One, N.A. v. Echo Acceptance Corp.,* No. 04-CV-318, 2008 WL 1766891, at *1 (S.D. Ohio Apr. 11, 2008).

## ARGUMENT

**I.    Dr. Zahniser Satisfies the Requirements Under Fed. R. Evid. 702.**

   *i. Dr. Zahniser Applied His Specialized Knowledge, Experience, And Education To Form Opinions That Will Assist The Trier Of Fact.*

Dr. Zahniser is a historian with nearly twenty years of experience. During this time, Zahniser's work and research have included historic contamination at complex multi-party Superfund sediment sites and waste streams of operations at various hazardous waste sites. Ex. A. In more than a decade of analyzing environmental matters, Dr. Zahniser has focused on the historical process, production, and waste streams of operations at hazardous waste sites. *Id*. Notably, Defendants do not provide the Court with a copy of Dr. Zahniser's curriculum vitae ("CV") and make no challenge of Dr. Zahniser's qualifications. To the extent Defendants do address Dr. Zahniser's qualifications, they misrepresent and blatantly disregard Zahniser's years of experience and expertise, concluding that Dr. Zahniser is simply "an expert on the Progressive Era" based on his academic focus in 1997. Defendants' Motion Memorandum at 2 (ECF 204). As evidenced by his CV, this is not an accurate description of Dr. Zahniser's expertise. Ex. A.

Understandably, Defendants do not argue that Zahniser lacks the knowledge, skill, experience, training, or education to offer an opinion.

> ii. *Dr. Zahniser Employed A Sound Methodology Matching The Intellectual Rigor Of Other Historians And Applied His Methods Reliably To The Facts Of The Case.*

The Sixth Circuit has held that an expert must be qualified in the specific subject area that forms the basis of the expert's opinion. *Rheinfrank v. Abbott Lab'ys, Inc.*, 680 F. App'x 369, 380-81 (6th Cir. 2017). As stated earlier in this memorandum, the Supreme Court in *Kumho Tire Co.* summarized the reliability requirement of *Daubert* as making "[c]ertain that an expert, whether basing testimony upon professional studies or professional experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Thus, the question at hand is whether Dr. Zahniser employed the same level of intellectual rigor as another expert in the field of historical document analysis and waste streams of hazardous waste sites. Notably, Defendants ignore and do not even include the important requirement of *Kumho* in their motion.

Defendants' argument that Dr. Zahniser's opinions are unreliable and not based on sound methodology ignores the substance of his opinions and his more than ten years of experience researching and examining the history of contaminated sites. Defendants rely on incorrect legal standards and ignore apposite precedent.

Defendants argue that Zahniser's report is unreliable because he failed to follow sound methodology. In support of their argument, Defendants rely on a constricted view of Rule 702, rigidly and incorrectly applying scientific *Daubert* factors to the social science of history. They erect an artificial mandate that Dr. Zahniser follow a self-serving definition of the historical method found in an online article. ECF 204 at 6. They ignore Dr. Zahniser's deployments of accepted methodology, the explicit flexibility of *Daubert,* and misapply the Rule 702 standard.

Here, Dr. Zahniser employed the same level of rigor as another expert within the same field. Had Defendants deposed Dr. Zahniser, he would have explained to them that he reviewed the evidence in this case as well as documents gathered in his own historical research and relied on his education, expertise, knowledge, and experience to develop opinions on Defendants' waste streams to the JCL. In CERCLA cases dating back decades, where the historical record is incomplete, such as the case here, a historian's expertise is in compiling the available historical data and using contextual knowledge to relate the history in an informed and credible way. Dr. Zahniser used his specialized expertise and experience to conduct historical research and gathered information from both the Jackson City Library (Jackson, Ohio) and the Ohio History Collection Library and Archives (Columbus, Ohio) regarding the JCL and the Defendants. *See* ECF 204-1 at ii-iii and ECF 204-2 at ii-iii. These historical documents included newspaper articles, business journals, documents from various manuscript collections, and other sources of business information. *See* ECF 204-1 at ii-iii and ECF 204-2 at ii-iii. Additionally, Dr. Zahniser relied on documents produced by Ohio EPA pertaining to the Site; documents produced by Ohio EPA pertaining to OSCO; documents produced by OSCO as part of the current litigation; the June 10, 1998, Deposition of J. Gregory Fields; the Kingsland Report; and declarations and depositions collected during discovery in the current litigation. Dr. Zahniser synthesized these disparate sources to form coherent opinions regarding the waste streams sent to the JCL.

Despite Defendants' incorrect assertion and mischaracterization of the Court's past rulings that the Fields Deposition and Kingsland Report have been deemed inadmissible, the soundness of Dr. Zahniser's opinions does not turn on whether those documents are admissible. The question is whether experts in his field would reasonably rely on such documents in evaluating the questions he was asked to evaluate. Fed. R. Evid. 703.

## II. Dr. Zahniser Properly Considered Documents and had an Adequate Basis for his Opinion Pursuant to Fed. R. Evid. 703.

Defendants argue that Dr. Zahniser improperly relied on documents, including the Fields Deposition, Fields Interview Notes, and Kingsland Report when drafting his report. Defendants ignore the applicable standard for the type of facts or data upon which an expert may base their opinions. Despite the fact that the Court has directly corrected Defendants' incorrect assertion that these documents had been ruled as inadmissible, *see* ECF 159 at 11-12, Defendants again make the assertion in their current motion. ECF 207 at 7. As evident in ECF 159, the Court has not deemed this evidence inadmissible, but even if it did, Federal Rule of Evidence 703 explicitly allows experts to rely on evidence that is or may later be deemed inadmissible. Notably, Defendants fail to cite Rule 703 even once in their motion. Under Rule 703:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. The Sixth Circuit itself interprets Rule 703 as follows:

> The purpose of Rule 703 is to make available to the expert all of the kinds of things that an expert would normally rely upon in forming an opinion, without requiring that these be admissible in evidence. Under the Rule, the expert is free to give his opinion relying upon the types of data an expert would normally use in forming an opinion in his area of expertise. In short, through Rule 703, the law is catching up with the realities of professional life.

*Mannino v. Int'l Mfg. Co.,* 650 F.2d 846, 851 (6th Cir. 1981).

Here, even if the Fields Deposition, Fields Interview Notes, and Kingsland Report were deemed inadmissible, Dr. Zahniser's reliance on those documents would be appropriate under the black letter law of Rule 703.

21130055.1

      *i.*     *The Documents are the Type of Facts or Data an Expert Would Rely Upon.*

There can be no reasonable dispute that the sworn deposition testimony of the longtime owner and operator of a site at issue is the type of material an expert would reasonably rely upon in a CERCLA matter. This is particularly so where, as here, the material is just one component of extensive evidence relied upon, much of which corroborates the material at issue. As the facts and data relied upon by the expert need not be admissible, they may include hearsay. *Kingsley Assocs., Inc. v. Del-Met, Inc.*, 918 F.2d 1277, 1286–87 (6th Cir. 1990). The admissibility of the hearsay does not matter. *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981). The question is "whether it is the type of material that expert witnesses often rely upon in forming opinions." *Id*. at 853. (emphasis added in original).

The Fields Deposition is sworn testimony of the owner and operator of the landfill who lived and worked at the Site every day. It is not only the type of evidence historians and other experts would rely on, it is some of the best evidence an expert could ask for. As discussed in detail above, Mr. Fields's testimony has been repeatedly corroborated, including by indisputably admissible documents from the relevant time period such as Ex. D, G, and F. The Fields Interview Notes and Kingsland Report were also repeatedly corroborated and appropriately relied upon by Dr. Zahniser. The Court need look no further than the sworn testimony of Defendants' own expert to recognize the disingenuousness of their argument. Defendants' expert stated under oath that he relied on the Fields Interview Notes. If the Fields Interview Notes are reliable, then surely Mr. Fields' heavily corroborated, under-oath deposition testimony is too. These three key documents represent some of the only—and most reliable—firsthand knowledge of operations at the landfill and the waste disposed of by OSCO and Reynolds and are the exact type of material historians

would rely on, as evidenced by the fact that Goodyear's experts and OSCO's expert relying on them.

## CONCLUSION

Dr. Zahniser satisfies the requirements of Rule 702, *Daubert*, and *Kumho* because his methodology matched the intellectual rigor of other historians. Dr. Zahniser appropriately relied on documents, including the Fields Deposition, Fields Interview Notes, and Kingsland Report. All were heavily corroborated and considered amongst several other lines of historical documents and evidence in accordance with Fed. R. Evid. 703. For the aforementioned reasons, Plaintiff respectfully requests this Court to deny Defendants' motion to exclude the export report of Dr. Zahniser.

Dated: November 6, 2023

Respectfully submitted,

*s/ Jeffrey D. Talbert*
Jeffrey D. Talbert, Trial Attorney (admitted *pro hac vice*)
PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
207-791-3000
jtalbert@preti.com

ATTORNEY FOR PLAINTIFF THE GOODYEAR TIRE & RUBBER COMPANY

21130055.1

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, a copy of the foregoing Opposition to Defendants' Joint Motion to Exclude the Expert Report of Keith A. Zahniser, Ph.D. was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access the filing through the Court's Electronic Case Filing System.

*s/ Jeffrey D. Talbert*
Jeffrey D. Talbert

21130055.1