# EXHIBIT 4

Case: 2:20-cv-06347-MHW-EPD Doc #: 271-4 Filed: 04/02/24 Page: 2 of 10 PAGEID #: 18960

THOMSON REUTERS
WESTLAW PRECISION    10-Q Section Search    advanced:    Sign out

10-Q filed by GOODYEAR TIRE & RUBBER CO /OH/
GOODYEAR TIRE & RUBBER CO /OH/ • CIK 0000042582 • 001-01927 • May 4, 2005 • 60 pa… View GOODYEAR TIRE & RUBBER CO /OH/ in Company Investigator

58 of 95 results    Compare text

Table of Contents

---

## SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## FORM 10-Q

### QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Quarterly Period Ended March 31, 2005

Commission File Number: 1-1927

# THE GOODYEAR TIRE & RUBBER COMPANY

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **OHIO** | **34-0253240** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **1144 East Market Street, Akron, Ohio** | **44316-0001** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(330) 796-2121**
(Registrant's Telephone Number, Including Area Code)

---

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑    No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).

Yes ☑    No ☐

Indicate the number of shares outstanding of each of the Registrant's classes of common stock, as of the latest practicable date.

Number of Shares of Common Stock,
Without Par Value, Outstanding at April 30, 2005: 175,944,378

Back to top

THE GOODYEAR TIRE & RUBBER COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

The facilities contain covenants similar to those in the $1.5 billion first lien credit facility, with special limits on the ability of GDTE and its subsidiaries to incur additional unsecured and secured indebtedness, make investments and sell assets beyond specified limits. The facilities also limit the amount of capital expenditures that GDTE may make to $200 million in 2005, $250 million in 2006 and $300 million per year thereafter, with the unused amount in any year carried forward to the succeeding years. In addition, under the facilities we are not permitted to allow the ratio of Consolidated Indebtedness (net of cash in excess of $100 million) to Consolidated EBITDA of GDTE to be greater than 2.75 to 1 at the end of any fiscal quarter. Under certain circumstances, borrowings under the term facility are required to be prepaid with proceeds of asset sales by GDTE and its subsidiaries greater than $15 million. Loans under the term loan facility bear interest at LIBOR plus 237.5 basis points. With respect to the revolving credit facilities, we pay an annual commitment fee of 75 basis points on the undrawn portion of the commitments and loans bear interest at LIBOR plus 275 basis points.

*Facilities Retired in the Refinancing*

*$680 Million U.S. Deposit-Funded Credit Facility*

As of March 31, 2005 and December 31, 2004, there were No borrowings under the facility and $513 million and $510 million, respectively, of letters of credit issued under the facility.

*$1.95 Billion Senior Secured Asset-Based Credit Facilities*

At March 31, 2005 and December 31, 2004, we had No borrowings outstanding under the revolving credit facility and $800 million drawn against the term loan asset-based facility. The $650 million term loan tranche, which was added to this facility in 2004, was fully drawn as of March 31, 2005 and December 31, 2004.

*$650 Million Senior Secured European Facilities*

Our joint venture in Europe, Goodyear Dunlop Tires Europe B.V. and subsidiaries (GDTE) was party to a $250 million senior secured revolving credit facility and a $400 million senior secured term loan facility. At March 31, 2005 and December 31, 2004, there were No borrowings outstanding under the senior secured revolving credit facility and the secured term loan facility was fully drawn.

**Insurance Settlement**

We reached agreement effective April 13, 2005, to settle our claims for insurance coverage for asbestos and pollution related liabilities with respect to pre-1993 insurance policies issued by certain underwriters at Lloyd's, London, and reinsured by Equitas Limited. The settlement agreement generally provides for the payment of money to us in exchange for the release by us of past, present and future claims under those policies and the cancellation of those policies; agreement by us to indemnify the underwriters from claims asserted under those policies; and provisions addressing the impact on the settlement should federal asbestos reform legislation be enacted on or before January 3, 2007.

Under the agreement, in the second quarter of 2005, Equitas will pay $22 million to us and will place $39 million into a trust. The trust funds may be used to reimburse us for a portion of costs we incur in the future to resolve certain asbestos claims. Our ability to use any of the trust funds is subject to specified confidential criteria, as well as limits on the amount that may be drawn from the trust in any one month. If federal asbestos reform legislation is enacted into law on or prior to January 3, 2007, then the trust would repay Equitas any amount it is required to pay with respect to our asbestos liabilities as a result of such legislation. If such legislation is not enacted by that date, any funds remaining in the trust will be disbursed to us to enable us to meet future asbestos-related liabilities or for other purposes.

-26-

Back to top

1

### Changes in Internal Control over Financial Reporting

Than the measures discussed in "Material Changes in Internal Control in 2005" above, which materially affected our internal control over financial reporting, there have been No changes in our internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

*Heatway Litigation and Amended Settlement*

As previously reported, we had entered into an amended settlement agreement intended to address claims arising out of a number of Federal, state and Canadian actions filed against us involving a rubber hose product, Entran II, that we supplied from 1989 to 1993 to Chiles Power Supply, Inc. (d/b/a Heatway Systems), a designer and seller of hydronic radiant heating systems in the United States. A description of our financial obligations and the extent to which certain claims are covered under the amended settlement is set forth in Item 3 of Part I of our 2004 Form 10-K.

Of the 62 sites that were initially opted-out of the amended settlement, 7 have now elected to rejoin the class. Of the 55 remaining opt-outs, approximately 14 are homesites in *Davis et al. v. Goodyear* (Case No. 99CV594, District Court, Eagle County, Colorado). In addition, one additional opt-out is a plaintiff in *Cross Mountain Ranch, LP v. Goodyear* (Case No. 04CV105, District Court, Routt County, Colorado), which is currently scheduled for trial in August, 2005. In *Albers Revocable Trust, et al. v. Goodyear* (Case No. 04CV2100, District Court, Arapahoe County, Colorado) one of the two original plaintiffs has elected to rejoin the class. We have been informed that 3 to 4 additional opt-outs may file actions against us in the future. Although liability resulting from the opt-outs described above will not be covered by the amended settlement, we will be entitled to assert a proxy claim against the settlement fund for the payment such claimant would have been entitled to under the amended settlement.

The ultimate cost of disposing of Entran II claims is dependent upon a number of factors, including our ability to resolve claims not subject to the amended settlement (including the cases in which we have received adverse judgments), the extent to which the liability, if any, associated with such a claim may be offset by our ability to assert a proxy claim against the settlement fund and whether or not claimants opting-out of the amended settlement pursue claims against us in the future.

*Asbestos Litigation*

As reported in the Form 10-K for the year ended December 31, 2004, we are one of numerous defendants in legal proceedings in certain state and Federal courts involving approximately 127,300 claimants relating to their alleged exposure to materials containing asbestos in products allegedly manufactured by us or asbestos materials present in our facilities. During the first quarter of 2005, approximately 2,600 new claims were filed against us and approximately 800 were settled or dismissed. The amount expended on asbestos defense and claim resolution by Goodyear and its insurance carriers during the first quarter of 2005 was $8 million. At March 31, 2005, there were approximately 129,100 claims pending against us relating to alleged asbestos-related diseases allegedly resulting from exposure to asbestos in products manufactured by us or in materials containing asbestos present in our facilities. The plaintiffs are seeking unspecified actual and punitive damages and other relief.

*Insurance Settlement*

We reached agreement effective April 13, 2005, to settle our claims for insurance coverage for asbestos and pollution related liabilities with respect to pre-1993 insurance policies issued by certain underwriters at Lloyd's, London, and reinsured by Equitas Limited. The settlement agreement generally provides for the payment of money

-50-

to us in exchange for the release by us of past, present and future claims under those policies and the cancellation of those policies; agreement by us to indemnify the underwriters from claims asserted under those policies; and provisions addressing the impact on the settlement should federal asbestos legislation be enacted on or before January 3, 2007.

Under the agreement, in the second quarter of 2005, Equitas will pay $22 million to us and will place $39 million into a trust. The trust funds may be used to reimburse us for a portion of costs we incur in the future to resolve certain asbestos claims. Our ability to use any of the trust funds is subject to specified confidential criteria, as well as limits on the amount that may be drawn from the trust in any one month. If federal asbestos reform legislation is enacted into law on or prior to January 3, 2007, then the trust would repay Equitas any amount it is required to pay with respect to our asbestos liabilities as a result of such legislation. If such legislation is not enacted by that date, any funds remaining in the trust will be disbursed to us to enable us to meet future asbestos-related liabilities or for other purposes.

Reference is made to Item 3 of Part I of the 2004 Form 10-K for additional discussion of legal proceedings.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

The following table presents information with respect to repurchases of common stock made by us during the three months ended March 31, 2005. These shares were delivered to us by employees as payment for the exercise price of stock options as well as the withholding taxes due upon the exercise of the stock option.

| Period | Total Number of Shares Purchased | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| 1/1/05-1/31/05 | — | — | — | — |
| 2/1/05-2/28/05 | — | — | — | — |
| 3/1/05-3/31/05 | 82,701 | $ 13.61 | — | — |
| Total | 82,701 | $ 13.61 | — | — |

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

The Annual Meeting of Shareholders of Goodyear was held on April 26, 2005 (the "Annual Meeting"). Proxies for the Annual Meeting were solicited pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (the "Act"), there was No solicitation in opposition to the five nominees of the Board of Directors of Goodyear listed in Goodyear's Proxy Statement, dated March 24, 2005, for the Annual Meeting (the "Proxy Statement"), filed with the Securities and Exchange Commission, and said four nominees were elected.

The following matters were acted upon by Goodyear shareholders at the Annual Meeting, at which 161,329,712 shares of the Common Stock, without par value, of Goodyear (the "Common Stock", the only class of voting securities of Goodyear outstanding), or approximately 91.8 percent of the 175,780,313 shares of Common Stock outstanding and entitled to vote at the Annual Meeting, were present in person or by proxies:

**1. Election of Directors.** Five persons were nominated by the Goodyear Board of Directors for election as directors of Goodyear. Gary D. Forsee, Denise M. Morrison and Thomas H. Weidemeyer were nominated as Class I directors, each to hold office for a three year term expiring at the 2008 annual meeting of Goodyear shareholders and until his or her successor is duly elected and qualified. John G. Breen and William J. Hudson, Jr. were nominated as Class III directors, to hold office for the remaining year of a three year term expiring at the 2006 annual meeting of Goodyear shareholders and until his successor is duly qualified. Each nominee was an incumbent director. No other person was nominated. Each nominee was elected. The votes cast for, or withheld or abstained with respect to, each nominee were as follows:

-51-

THOMSON REUTERS
WESTLAW PRECISION   10-Q Section Search   advanced:   Sign out

### 10-Q filed by GOODYEAR TIRE & RUBBER CO /OH/
GOODYEAR TIRE & RUBBER CO /OH/ · CIK 0000042582 · 001-01927 · August 4, 2005 · 67 ... View GOODYEAR TIRE & RUBBER CO /OH/ in Company Investigator

57 of 95 results     Compare text

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## FORM 10-Q

### QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Quarterly Period Ended June 30, 2005

Commission File Number: 1-1927

# THE GOODYEAR TIRE & RUBBER COMPANY

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **OHIO** | **34-0253240** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **1144 East Market Street, Akron, Ohio** | **44316-0001** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(330) 796-2121**
(Registrant's Telephone Number, Including Area Code)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑     No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).

Yes ☑     No ☐

Indicate the number of shares outstanding of each of the Registrant's classes of common stock, as of the latest practicable date.

Number of Shares of Common Stock,

THE GOODYEAR TIRE & RUBBER COMPANY AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

We reached an agreement effective April 13, 2005, to settle our claims for insurance coverage for asbestos and pollution related liabilities with respect to pre-1993 insurance policies issued by certain underwriters at Lloyd's, London, and reinsured by Equitas. The settlement agreement generally provides for the payment of money to us in exchange for the release by us of past, present and future claims under those policies and the cancellation of those policies; agreement by us to indemnify the underwriters from claims asserted under those policies; and includes provisions addressing the impact on the settlement should federal asbestos reform legislation be enacted on or before January 3, 2007.

Under the agreement, Equitas paid $22 million to us and placed $39 million into a trust. The trust funds may be used to reimburse us for a portion of costs we incur in the future to resolve certain asbestos claims. Our ability to use any of the trust funds is subject to specified confidential criteria, as well as limits on the amount that may be drawn from the trust in any one month. If federal asbestos reform legislation is enacted into law on or prior to January 3, 2007, then the trust would repay Equitas any amount it is required to pay with respect to our asbestos liabilities as a result of such legislation. If such legislation is not enacted by that date, any funds remaining in the trust will be disbursed to us to enable us to meet future asbestos-related liabilities or for other purposes.

We believe that our reserve for asbestos claims, and the receivable for recoveries from insurance carriers recorded in respect of these claims, reflect reasonable and probable estimates of these amounts, subject to the exclusion of claims for which it is not feasible to make reasonable estimates. The estimate of the assets and liabilities related to pending and expected future asbestos claims and insurance recoveries is subject to numerous uncertainties, including, but not limited to, changes in:

- the litigation environment,

- federal and state law governing the compensation of asbestos claimants,

- recoverability of receivables due to potential insolvency of carriers,

- our approach to defending and resolving claims, and

- the level of payments made to claimants from other sources, including other defendants.

As a result, with respect to both asserted and unasserted claims, it is reasonably possible that we may incur a material amount of cost in excess of the current reserve, however, such amount cannot be reasonably estimated. Coverage under insurance policies is subject to varying characteristics of asbestos claims including, but not limited to, the type of claim (premise vs. product exposure), alleged date of first exposure to our products or premises and disease alleged. Depending upon the nature of these characteristics, as well as the resolution of certain legal issues, some portion of the insurance may not be accessible by us.

**Heatway (Entran II).** On June 4, 2004, we entered into an amended settlement agreement that was intended to address the claims arising out of a number of Federal, state and Canadian actions filed against us involving a rubber hose product, Entran II. We supplied Entran II from 1989 to 1993 to Chiles Power Supply, Inc. (d/b/a Heatway Systems), a designer and seller of hydronic radiant heating systems in the United States. Heating systems using Entran II are typically attached or embedded in either indoor flooring or outdoor pavement, and use Entran II hose as a conduit to circulate warm fluid as a source of heat. We had recorded liabilities related to Entran II claims totaling $302 million at June 30, 2005 and $307 million at December 31, 2004.

On October 19, 2004, the amended settlement received court approval. As a result, we have made, or will make annual cash contributions to a settlement fund of $60 million, $40 million, $15 million, $15 million and $20 million in 2004, 2005, 2006, 2007 and 2008, respectively. In addition to these annual payments, we contributed approximately $170 million received from insurance contributions to a settlement fund pursuant to the terms of the settlement agreement. We do not expect to receive any additional insurance reimbursements for Entran II related matters.

After reaching a preliminary settlement in a state court action involving 14 sites, approximately 41 sites remain opted-out of the amended settlement. Two actions involving approximately 10 of these sites are currently pending against us, and additional actions may be filed against us in the future. Although any liability resulting from the opt-outs will not be covered by the amended settlement, we will be entitled to assert a proxy claim against the settlement fund for the payment such claimant would have been entitled to under the amended settlement.

Case: 2:20-cv-06347-MHW-EPD Doc #: 271-4 Filed: 04/02/24 Page: 8 of 10  PAGEID #: 18966

THOMSON REUTERS
WESTLAW PRECISION    10-Q Section Search    advanced:    Sign out

10-Q filed by GOODYEAR TIRE & RUBBER CO /OH/
GOODYEAR TIRE & RUBBER CO /OH/ · CIK 0000042582 · 001-01927 · October 27, 2005…    View GOODYEAR TIRE & RUBBER CO /OH/ in Company Investigator

56 of 95 results    Compare text

**Table of Contents**

---

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended September 30, 2005

Commission File Number: 1-1927

# THE GOODYEAR TIRE & RUBBER COMPANY

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **OHIO** | **34-0253240** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **1144 East Market Street, Akron, Ohio** | **44316-0001** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(330) 796-2121**
(Registrant's Telephone Number, Including Area Code)

---

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days.

Yes ☑      No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).

Yes ☑      No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐      No ☑

**THE GOODYEAR TIRE & RUBBER COMPANY AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Unaudited)

We believe that, at September 30, 2005, we had at least $176 million in aggregate limits of excess level policies potentially applicable to indemnity payments for asbestos products claims, in addition to limits of available primary insurance policies. Some of these excess policies provide for payment of defense costs in addition to indemnity limits. A portion of the availability of the excess level policies is included in the $56 million insurance receivable recorded at September 30, 2005. We also had approximately $21 million in aggregate limits for products claims, as well as coverage for premise claims on a per occurrence basis and defense costs, available with our primary insurance carriers through coverage-in-place agreements at September 30, 2005.

We reached an agreement effective April 13, 2005, to settle our claims for insurance coverage for asbestos and pollution related liabilities with respect to pre-1993 insurance policies issued by certain underwriters at Lloyd's, London, and reinsured by Equitas. The settlement agreement generally provides for the payment of money to us in exchange for the release by us of past, present and future claims under those policies and the cancellation of those policies; agreement by us to indemnify the underwriters from claims asserted under those policies; and includes provisions addressing the impact on the settlement should federal asbestos reform legislation be enacted on or before January 3, 2007.

Under the agreement, Equitas paid $22 million to us and placed $39 million into a trust. The trust funds may be used to reimburse us for a portion of costs we incur in the future to resolve certain asbestos claims. Our ability to use any of the trust funds is subject to specified confidential criteria, as well as limits on the amount that may be drawn from the trust in any one month. If federal asbestos reform legislation is enacted into law on or prior to January 3, 2007, then the trust would repay Equitas any amount it is required to pay with respect to our asbestos liabilities as a result of such legislation up to the amount remaining in the trust at that time. If such legislation is not enacted by that date, any funds remaining in the trust will be disbursed to us to enable us to meet future asbestos-related liabilities or for other purposes.

We also reached an agreement effective July 27, 2005, to settle our claims for insurance coverage for asbestos and pollution related liabilities with respect to insurance policies issued by certain other non-Equitas excess insurance carriers which participated in policies issued in the London Market. The settlement agreement generally provides for the payment of $25 million to us in exchange for the release by us of past, present and future claims under those policies and the cancellation of those policies; and agreement by us to indemnify the underwriters from claims asserted under those policies. In conjunction with the settlement we recorded a gain of $14 million during the third quarter.

We believe that our reserve for asbestos claims, and the receivable for recoveries from insurance carriers recorded in respect of these claims, reflect reasonable and probable estimates of these amounts, subject to the exclusion of claims for which it is not feasible to make reasonable estimates. The estimate of the assets and liabilities related to pending and expected future asbestos claims and insurance recoveries is subject to numerous uncertainties, including, but not limited to, changes in:

- the litigation environment,

- Federal and state law governing the compensation of asbestos claimants,

- recoverability of receivables due to potential insolvency of carriers,

- our approach to defending and resolving claims, and

- the level of payments made to claimants from other sources, including other defendants.

As a result, with respect to both asserted and unasserted claims, it is reasonably possible that we may incur a material amount of cost in excess of the current reserve, however, such amount cannot be reasonably estimated. Coverage under insurance policies is subject to varying characteristics of asbestos claims including, but not limited to, the type of claim (premise vs. product exposure), alleged date of first exposure to our products or premises and disease alleged. Depending upon the nature of these characteristics, as well as the resolution of certain legal issues, some portion of the insurance may not be accessible by us.

**Heatway (Entran II).** On June 4, 2004, we entered into an amended settlement agreement that was intended to address the claims arising out of a number of Federal, state and Canadian actions filed against us involving a rubber hose product, Entran II. We supplied Entran II from 1989 to 1993 to Chiles Power Supply, Inc. (d/b/a Heatway Systems), a designer and seller of hydronic radiant heating systems in the United States. Heating systems using Entran II are typically attached or embedded in either indoor flooring or outdoor pavement, and use Entran II hose as a conduit to circulate warm fluid as a source of heat. We had recorded liabilities related to Entran II claims totaling $267 million at September 30, 2005 and $307 million at December 31, 2004.

Table of Contents

## RESULTS OF OPERATIONS



### CONSOLIDATED

***Three Months Ended September 30, 2005 and 2004***

Net sales in the third quarter of 2005 were $5,030 million, increasing $330 million, or 7.0% from $4,700 million in the 2004 third quarter. Net income of $142 million, or $0.70 per share, was recorded in the 2005 third quarter compared to net income of $38 million, or $0.20 per share, in the third quarter 2004.

Net sales in the third quarter of 2005 in our tire segments were impacted by favorable price and product mix of approximately $182 million, higher volume of approximately $62 million and a positive impact from currency translation of approximately $58 million. Sales also increased approximately $28 million in the Engineered Products Division, mainly due to improvements in price and product mix of approximately $19 million and currency translation of $11 million.

Worldwide tire unit sales in the third quarter of 2005 were 58.4 million units, an increase of 1.0 million units, or 1.8% compared to the 2004 period. This increase was driven by a 0.6 million, or 1.6% unit increase in the consumer replacement market and a 0.6 million unit, or 4.6% increase in the consumer OE market. The increase was offset by lower unit sales of 0.1 million units, or 1.7% in the commercial market and 0.1 million units, or 13% in other tire related businesses.

Cost of goods sold (CGS) in the third quarter of 2005 was $4,008 million, an increase of $258 million, or 6.9% compared to the third quarter 2004, while decreasing as a percentage of sales to 79.7% from 79.8% in the 2004 comparable period. CGS for our tire segments in the third quarter of 2005 increased due to higher raw material costs of approximately $141 million and higher volume of approximately $49 million. Also contributing to the CGS increase was foreign currency translation of approximately $20 million and product mix related manufacturing cost increases of approximately $32 million. CGS also increased by $38 million in the Engineered Products Division, primarily related to higher conversion costs of $10 million, increased raw material costs of $7 million and foreign currency translation of $9 million. Partially offsetting these CGS increases was lower conversion costs of approximately $13 million in our tire segments, driven by lower OPEB costs and savings from rationalization programs.

Selling, administrative and general expense (SAG) was $707 million in the third quarter of 2005, compared to $703 million in 2004, an increase of $4 million. The increase was driven primarily by higher wage and benefits expenses, which increased by $11 million in the quarter for our tire segments, foreign currency translation of $6 million and charges of $4 million related to the recent hurricanes. Partially offsetting these increases in SAG were lower product liability expenses of $11 million and cost savings of $3 million from rationalization programs. SAG as a percentage of sales was 14.1% in the third quarter 2005, compared to 14.9% in the third quarter of 2004.

Interest expense increased by $8 million to $103 million in the third quarter of 2005 from $95 million in the third quarter of 2004 primarily as a result of higher average interest rates and interest penalties.

Other (income) and expense was $35 million of income in the 2005 third quarter, an improvement of $73 million, compared to $38 million of expense in the 2004 third quarter. The increase was primarily related to a gain of $25 million on the sale of the Wingtack adhesive resins business in the North American Tire Segment and a gain of $14 million from an insurance settlement with certain insurance companies related to environmental and asbestos coverage. In addition, in the third quarter of 2005, we had $8 million of lower general & product liability expenses. Also in the three months ended September 30, 2004, there was an additional $12 million of higher financing fee expenses due to higher deferred fee levels and shorter amortization periods compared to the comparable period in 2005.

For the third quarter of 2005, we recorded tax expense of $71 million on income before income taxes and minority interest in net income of subsidiaries of $238 million. Included in this amount was a net tax benefit of $3 million primarily related to the settlement of prior years' tax liabilities. For the third quarter of 2004, we recorded tax expense of $29 million on income before income taxes and minority interest in net income of subsidiaries of $85 million. Included in this amount was a net tax benefit of $44 million primarily related to the settlement of prior years' tax liabilities.